SC:WMN
F. #2013R01203

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

14-711 M

———– – – – – – – – – – – – – X

IN THE MATTER OF AN APPLICATION
FOR A SEARCH WARRANT FOR:

THE PREMISES KNOWN AND
DESCRIBED AS ONE CELLULAR
TELEPHONE WITH TELEPHONE
NUMBER 732-261-6430, ISSUED BY
CELLCO PARTNERSHIP DBA VERIZON
WIRELESS AND SUBSCRIBED TO MARC
WEXLER, 1070H HIGHWAY 34, 113,
MATAWAN, NEW JERSEY 07747-3480,
WITH IMEI NUMBER 3587550549123605

AFFIDAVIT IN SUPPORT
OF APPLICATION FOR A
SEARCH WARRANT

———– – – – – – – – – – – – – X

EASTERN DISTRICT OF NEW YORK, SS:

        Constantine Voulgaris, being duly sworn, deposes and states that he is a

Special Agent with the Federal Bureau of Investigation, duly appointed according to law and

acting as such.

        Upon information and belief, there is probable cause to believe that there is

located in THE PREMISES KNOWN AND DESCRIBED AS ONE CELLULAR

TELEPHONE WITH TELEPHONE NUMBER 732-261-6430, ISSUED BY CELLCO

PARTNERSHIP DBA VERIZON WIRELESS AND SUBSCRIBED TO MARC WEXLER,

1070H HIGHWAY 34, 113, MATAWAN, NEW JERSEY 07747-3480, WITH IMEI

NUMBER 3587550549123605 (hereinafter "DEVICE 1"), further described in Attachment A,

the things described in Attachment B, which constitute evidence, fruits and instrumentalities

of a conspiracy to commit securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1349.

The source of your deponent's information and the grounds for his belief are as follows:[1]

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), I have been employed by the FBI since 2010.  During my tenure with the FBI, I have participated in numerous white collar fraud investigations and have participated in all aspects of investigations, including conducting surveillance, executing search warrants, debriefing defendants and informants, interviewing witnesses, and reviewing and analyzing recorded conversations.  During the course of these investigations, I have served as an investigator in the investigation and prosecution of persons involved in wire fraud, securities fraud and mail fraud. I am aware that white collar criminals commonly use electronic means of communication in furtherance of their criminal activities, including but not limited to telephones and electronic mail.  As a result of my training and experience, I am familiar with the techniques and methods of operation used by individuals involved in criminal activity to conceal their activities from detection by law enforcement authorities.

2.      I have personally participated in the investigation of the offenses discussed below.  I am familiar with the facts and circumstances of this investigation from: (a) my personal participation in this investigation, (b) reports made to me by other law enforcement and regulatory authorities, (c) information obtained from confidential sources of information, (d)

---

[1]      Because this affidavit is submitted for the limited purpose of establishing probable cause for a search warrant, I have not set forth each and every fact learned from the agents who conducted the investigation.

interviews with witnesses and victims, (e) information obtained from the execution of search warrants  and court-authorized interception of wire and electronic communications; and, (f) review of surveillance photographs and other records and reports.  Except where otherwise noted, all conversations described in this Affidavit are set forth in part and in substance only.

I.      BACKGROUND

3.      The FBI is currently investigating mail, wire and securities fraud committed through, among other things, the unlawful manipulation of publicly-traded stocks by artificially controlling the price and volume of traded shares in the manipulated stocks through, inter alia: (a) false and misleading press releases; (b) false and misleading SEC filings; (c) fraudulently concealing co-conspirators' ownership interests in the manipulated public companies; (d) generating concocted trading volume in the stock; and (e) unauthorized purchases of stock in accounts of unwitting investors.   The scheme is being perpetrated by a group of financial professionals acting in concert with officers, directors, employees and shareholders of the companies whose publicly-traded stock is being manipulated (collectively, the "Co-conspirators").   Included in this group are the following individuals who are or have been associated with the following entities:

a.      Abraxas J. Discala, also known as "AJ Discala," a resident of the Rowayton area of Norwalk, Connecticut.  Discala is the Chief Executive Officer of OmniView Capital Advisors LLC ("OmniView"), a Delaware limited liability company with its principal place of business at 140 Rowayton Ave, Suite C, Norwalk, Connecticut 06853, and an office in New York, New York.   Discala formed OmniView on or about February 3, 2011.  Discala also controlled The Broadsmoore Group LLC ("Broadsmoore") and Fidelis Holdings, LLC ("Fidelis").  OmniView marketed itself as a merchant bank that sought to create partnerships

with companies that were fundamentally sound in order to provide required capital and strategic advice.

b.       Marc E. Wexler, a resident of Colts Neck, New Jersey, is the Managing Director of OmniView and the user of DEVICE 1.

c.       Ira S. Shapiro, a resident of Congers, New York, is the Chief Executive Officer and Chairman of the Board of Codesmart Holdings, Inc.

d.       Matthew A. Bell, a former resident of Helotes, Texas, and a current resident of Boerne, Texas, was registered as a broker and an investment adviser representative.  In or about and between October 2009 and December 2013, Bell was employed as an investment adviser representative by Alamo Investment Advisors, LLC, dba, Alamo Asset Advisors ("Alamo"), an investment adviser firm registered with the United States Securities and Exchange Commission ("SEC").  In or about and between July 2009 and June 2013, Bell was employed as a broker by WFG Investments, Inc. ("WFG Investments"), a brokerage firm registered with the SEC and the Financial Industry Regulatory Authority, Inc. ("FINRA"), at its office in San Antonio, Texas.  In or about and between August 2013 and October 2013, Bell was employed as a broker by Securities America, Inc., a brokerage firm registered with the SEC and FINRA, at its office in San Antonio, Texas.

e.       Craig L. Josephberg, also known as "Jobo," a resident of New York, New York, is registered as a broker.  In or about and between October 2013 and June 2014, Josephberg was employed as a broker by Meyers Associates, L.P. ("Meyers"), a brokerage firm registered with the SEC and FINRA, at its office in New York, New York.  In or about and between November 2010 and October 2013, Josephberg was employed as a broker by Halcyon Cabot Partners, Ltd. ("Halcyon"), a brokerage firm registered with the SEC and FINRA, at its

office in New York, New York.  Josephberg also controlled Garper LLC ("Garper"), a Delaware limited liability company with its principal place of business in New York, New York.

   f. Kyleen Cane, an attorney and a resident of Las Vegas, Nevada, is the managing partner of Cane Clark LLP, a law firm that purportedly specialized in providing corporate and securities legal services to public companies with small capitalization.

   g. Victor Azrak, a resident of Brooklyn, New York, is the Vice President and Director of Excel Corp. ("EXCC"), a publicly traded Delaware company with its principal place of business in New York, New York.

   4. As described in more detail below, this fraudulent scheme first came to the attention of the FBI when agents learned from a confidential source ("CS 1") about the possible stock manipulation of CodeSmart Holdings, Inc. and its affiliated companies (hereinafter collectively "CodeSmart").  However, as discussed below, CodeSmart shares are not the only securities being manipulated.  The evidence now demonstrates that the Co-conspirators have manipulated and are continuing to manipulate other publicly traded stocks, including the stocks of: (i) Cubed, Inc. ("Cubed"), trading under the symbol CRPT; (ii) StarStream Entertainment Inc. ("StarStream"), trading under the ticker symbol SSET; and (iii) The Staffing Group, Ltd. ("Staffing Group"), trading under the ticker symbol TSGL.  As discussed below, the Co-conspirators are using, among other things, cellular telephones, that contain electronically stored information and data, and other documents, communications and electronic data, including text messages and e-mails, to accomplish this unlawful activity.

   5. During the course of the investigation, the government applied for and received several court orders for pen registers, cell site orders, text message search warrants and e-mail search warrants relating to cellular telephones and e-mail accounts used by certain co-

conspirators.  In addition, on May 1, 2014, the Honorable P. Kevin Castel, United States District

Judge for the Southern District of New York, authorized the interception of wire and electronic

communications over 914-255-7892, a cellular telephone subscribed to Abraxas J. Discala ("the

Discala Cell Phone").  Interception of the Discala Cell Phone began on May 2, 2014, and, as

Wexler used DEVICE 1 to communicate with the Discala Cell Phone, those communications

were captured during the wiretap.   On May 30, 2014, the Honorable Alvin K. Hellerstein,

United States District Judge for the Southern District of New York, authorized the continued

interception of the Discala Cell Phone.   Interception of the Discala Cell Phone terminated on

June 29, 2014.

6.      As set forth below, information obtained pursuant to these warrants and

orders furthered the investigation by providing highly relevant communications between the Co-

conspirators concerning the ongoing manipulation of publicly traded stocks, including the stock

of Cubed.

7.      On July 14, 2014, a grand jury in the Eastern District of New York

returned a ten-count indictment against Discala, Wexler, Shapiro, Bell, Josephberg, Cane, and

Azrak, and arrest warrants were issued.  A copy of the indictment is attached as Attachment C.

8.      Wexler was arrested on or about July 17, 2014, and DEVICE 1 was seized

incident to his arrest.

II.   TECHNICAL TERMS

9.      In this affidavit, I use terms that have the following meanings:

a.      **Wireless telephone** (or mobile or cellular telephone):  A

handheld wireless device used for voice and data communication through radio signals.

These telephones send signals through networks of transmitter/receivers, enabling

communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books," sending, receiving and storing text messages and email; taking, sending, receiving and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device, and a wide variety of applications, also known as "apps," which may store the user's preferences and other data.  Such apps may include Facebook, Twitter and other social media services.

> b.   **IP Address:**  An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer or other electronic device, such as DEVICE 1 and DEVICE 2, that connects to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static-that is, long-term -- IP addresses, while other computers have dynamic -- that is, frequently changed -- IP addresses.

> 10.   Based on the lead case agents' training, experience, discussions with other agents and knowledge of this investigation, including the fact that the electronic

interceptions showed the Co-conspirators using their telephones to download applications, agents believe that DEVICE 1 provides not only phone and text message services, but can also be used to send and receive emails; access the Internet; track GPS data; take, store and share photographs and videos; and use a wide variety of apps, such as Facebook, Twitter and many others.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used DEVICE 1.

III.    PROBABLE CAUSE TO SEARCH THE DEVICES

      A.    The Beginning of the Scheme: The CodeSmart Reverse Merger

      11.    First Independence Corporation ("First Independence") was founded in Florida in February 2012 as a public corporation, and as such was able to be traded publicly under the ticker symbol "FICF."  As set forth in the attached indictment, in January 2013, First Independence sold its entire lot of 3,000,000 shares to twenty-four shareholders, based primarily in Florida, for $0.0115 per share, raising $34,500 for the company.  From February 2013 to April 2013, there was no public trading of First Independence's stock.  On May 3, 2013, First Independence acquired CodeSmart in a reverse merger.  Following the reverse merger, the new company operated under the CodeSmart name.  Between May 7, 2013 and May 24, 2013, the 24 aforementioned First Independence shareholders sold all 3,000,000 shares to individuals and entities connected to Discala and Wexler for a purchase price of $0.023 per share (exactly double the purchase price for the original shareholders).

      12.    Although the merger appeared to have First Independence subsume CodeSmart, by an amendment in its articles of incorporation executed that same month by Chief Executive Officer ("CEO") Ira Shapiro (who was not the CEO of First Independence

before the merger), First Independence changed its name to CodeSmart Group Holdings, Inc., and later changed its ticker symbol to "ITEN." Thus, CodeSmart, a private company, effectively took over First Independence, a publicly-traded company, in a way that enabled CodeSmart to become a publicly-traded company.

13.     CodeSmart traded under the ticker symbol ITEN.  On its website and public filings, CodeSmart marketed itself as a company whose business plan consisted of furnishing the healthcare industry with educated, trained and qualified "ICD-10" certified coders.[1]   CodeSmart offered "CodeSmart University" as "an online program of study for existing coders, new coders, clinicians and healthcare roles of all types."

B.     The Fraudulent Manipulation of CodeSmart Stock

14.     As described in the attached indictment, after gaining control of CodeSmart's unrestricted shares, Discala, Wexler, Shapiro, Bell and Josephberg, together with others (the "CodeSmart Co-Conspirators"), devised a scheme whereby they fraudulently inflated CodeSmart's share price and trading volume and then sold the unrestricted CodeSmart stock at a profit when the share price reached desirable levels.  Such a scheme is commonly referred to as a "pump and dump."

15.     In furtherance of the CodeSmart stock manipulation scheme, the CodeSmart Co-Conspirators, with others, coordinated their trading activity with the issuance of company press releases, a number of which contained false and misleading information.  For example, shortly after the reverse merger, CodeSmart issued a press release, on May 28, 2013, stating that "[t]he CodeSmart Group Inc. . . . announces today that its CodeSmart University

---

[1]     ICD-10, the tenth revision of the International Statistical Classification of Diseases and Related Health Problems, a medical classification list created by the World Health Organization, was the medical coding system mandated by the Centers for Medicare and Medicaid Services as part of the Patient Protection and Affordable Care Act of 2010.

product is the exclusive strategic partner for ICD-10 education and consulting services to Binghamton University, part of the State University of New York ('SUNY') system, which will exclusively market and provide CodeSmart University products to their students in the School for Continuing Education." The press release included a quote from CEO Shapiro, stating "Binghamton University has already begun to offer CodeSmart University programs for both experienced coders and new coders [and] will serve as the distribution channel to all SUNY schools throughout New York State." Based on agents' conversations and email communications with representatives of Binghamton University, agents have determined that this press release was not authorized by Binghamton University and contained multiple material false statements. First, CodeSmart was not the "exclusive strategic partner" for ICD-10 education courses at Binghamton University, as Binghamton University also offered courses through other providers, and Binghamton University had no plans to exclusively market CodeSmart University to its students. Second, contrary to Shapiro's quote that made it appear as if many students had taken the CodeSmart University course, Binghamton University had been offering the CodeSmart course for some time but only one person had ever registered to take the course.

16.     The above-described false statements made CodeSmart appear to the public to be more successful than it was in actuality. Based on my training and experience, I know that material false statements to the public in favor of a company's business can have the effect of artificially increasing the share price of that company's stock. As described below, such increases were subsequently seen in CodeSmart shares.

17.     On May 28, 2013, the date of the press release involving Binghamton University, the volume of CodeSmart shares traded jumped significantly–approximately

triple the volume traded the day before the press release.  In addition, on the date of the press release, the price of CodeSmart shares increased by almost five percent, from $5.02 per share to $5.26 per share, a substantial one-day increase for a company's share price.

18.     On June 4, 2013, CodeSmart issued a press release stating that "The CodeSmart Group Inc. . . . announces today that its CodeSmart University product is the exclusive strategic partner for ICD-10 education and consulting services to Ramapo College in Northern New Jersey, which will exclusively market and provide CodeSmart University products to their students at the Center for Innovative and Professional Learning."  This press release contained a material false statement in that, in addition to the press release not being authorized by Ramapo College, as of the date of the statement Ramapo College had not finalized an agreement with CodeSmart but, rather, the parties were only in the advanced negotiation stage.

19.     Later in the day, after the issuance of the press release, on June 4, 2013, a representative of Ramapo College emailed representatives of CodeSmart to complain about the unauthorized press release, stating that she was "very concerned" about the press release, noting "[a]s you know, we are not yet approved . . . to proceed with a contract for this program."  The email further requested that CodeSmart "halt any further communications/promotions about a partnership with Ramapo College."  A CodeSmart employee responded by email the same day and apologized for the press release.  At approximately the same time, CodeSmart's CEO Ira Shapiro similarly apologized via email, claiming CodeSmart "certainly will consult with you next time we do a promotion."  However, Shapiro noted, "This is all done in the spirit of promoting business opportunities for you as a partner."  CodeSmart never issued a revised or amended press release concerning its relationship with Ramapo College.  Shapiro's June 4, 2013, email indicates that, at the time the press release was issued, CodeSmart's CEO knew that the

claim that the "CodeSmart University product is the exclusive strategic partner for ICD-10 education and consulting services to Ramapo College" was false.

20.     On June 4, 2013, the date of the press release involving Ramapo College, the price of CodeSmart shares increased by approximately three percent. That same week, other announcements from CodeSmart caused yet additional increases such that, by Friday of that week, the price of CodeSmart shares had increased approximately 18 percent in just five days.

21.     In the period between May 13, 2013 and July 12, 2013, CodeSmart issued press releases at the approximate rate of one press release every three days and in that period the stock price of CodeSmart rose by 291 percent. In fact, on July 12, 2013, CodeSmart publicly filed with the SEC an amended Form 8-K, which on page 12, under a section titled "Plan of Operations," stated, "We estimate about $10 million in revenues over the following 12 months from the date of this Report." On the date of that filing, CodeSmart's share price peaked, closing at $6.94 per share. Based on my training and experience, I know that a rise of 291 percent is an unusually rapid rise and an unusually high rate of share price increase.

22.     Over the next month, the share price rapidly decreased, such that by August 19, 2013, the company was valued at $2.50 per share. In fact, on August 19, 2013 – approximately one month after the company's $10 million revenue forecast – CodeSmart filed a Form 10-Q with the SEC stating that the company did "not have sufficient funds to fully implement [its] business plan" and that, if they did not obtain the funds, CodeSmart "may need to curtail or cease [its] operations until such time as [it has] sufficient funds." Thus, in the span of one month, CodeSmart's revenue forecast went from $10 million to ceasing operations, effectively a $0 revenue forecast.

23.     Three days later, however, on August 22, 2013, CodeSmart issued a press release stating that it had partnered with Millennium HealthCare, Inc. to market its ICD-10 educational and consulting services for medical practices and hospitals.  A few days after that, on August 26, 2013, at a time when CodeSmart's stock was rising and closed at $3.10 per share, CodeSmart issued a letter to its shareholders that stated, in part: "If we continue on the track we are on, I believe we will achieve our revenue and profit goals that were previously disclosed for 2013 and beyond.  We believe we have access to a large market of potential students which we estimate to be over 40 million people looking for careers at any given time."

24.     The next day, on August 27, 2013, CodeSmart filed with the SEC a Form 8-K, signed by Shapiro, in which CodeSmart announced that CodeSmart's Chief Executive Officer, Shapiro, had purchased 25,000 shares of the company's stock from the public market at the market value of $3.21 per share for a cost of $80,250.  In this SEC filing, Shapiro stated that his "stock purchase [was] symbolic of [his] confidence in the Company and its mission."  In reality, Shapiro did not pay for the 25,000 CodeSmart shares purchased in his brokerage account.  On September 4, 2013, the same day that Shapiro paid $81,278 from his personal bank account to his brokerage firm for the 25,000 shares of CodeSmart, Discala directed the transfer of $81,278 from Fidelis' bank account to Shapiro's personal bank account.

25.     Between August 21, 2013 and August 30, 2013, CodeSmart's share price more than doubled, rising from $2.19 to $4.60.  CodeSmart's share price then went into a rapid decline, dropping to $2.13 by September 20, 2013.  All of the above-noted facts, as well my training and experience, support my belief that individuals associated with CodeSmart disseminated false statements in an effort to artificially inflate the price of CodeSmart shares.  At the close of business on May 23, 2014, CodeSmart's share price was $0.29.  The chart below,

from Yahoo! Finance, a website that reports market information, displays the rise and subsequent

fall of CodeSmart's share price and trading volume from June 2013 through May 2014.



26.     The fraudulent manipulation of CodeSmart's stock is further evident from

an examination of the economic reality.  At a stock price of $6.94, a price reached on July 12,

2013, CodeSmart's market capitalization was $86,347,800.  However, that same day, CodeSmart

filed with the SEC an amended Form 10-K, signed by Shapiro, in which CodeSmart listed only

$6,000 in total assets, $7,600 in revenue and a net loss of $103,141.  By December 30, 2013,

CodeSmart's stock was trading at $0.66 per share, and on July 9, 2014, CodeSmart's stock

closed at $0.01 per share.

C.     The Co-Conspirators Coordinated Trading in CodeSmart

27.     Between May 13, 2013 and September 20, 2013, Discala and his co-conspirators coordinated the trading of their unrestricted shares with press releases and SEC filings issued by Shapiro to maintain a market in CodeSmart and sell their considerable holdings in CodeSmart at substantial profits.  The transfer agent records revealed that Discala, Wexler, Bell and Josephberg controlled the vast majority of CodeSmart's "freely trading" float, which they attempted to conceal through entities and other individuals.  Both Bell and Josephberg received 125,000 purportedly unrestricted shares of CodeSmart for pennies in exchange for investing certain of their customer base in CodeSmart.  When trading started in earnest on May 13, 2013, Discala and Wexler flooded the market with CodeSmart's shares.  This trading, which often constituted a significant portion of the volume of trading in CodeSmart, included multiple days where they bought and sold large amounts of stock with no evident economic purpose.

28.     Discala carried out a substantial portion of the trading in the name of his administrative assistant and in the name of LLCs for which he was the CEO.   New York case agents believe Discala did this in order to avoid being seen as holding more than five percent of the outstanding shares of CodeSmart and thereby becoming subject to SEC reporting obligations.  Discala also repeatedly paid excessive commissions for his transactions in CodeSmart.  In fact, at one point, Raymond James & Associates, Inc. ("Raymond James") sent him a letter warning him that the commissions he was paying for his trading were excessive.  Even after receiving this letter, Discala continued to use the Raymond James account to trade CodeSmart.

29.     Beginning in May 2013, Discala and his co-conspirators used Bell's clients' accounts to dump their CodeSmart shares.  Between May 13, 2013 and May 29, 2013, Wexler, Discala, Discala's assistant and OmniView sold approximately 340,000 shares.  During

15

that time period the price of CodeSmart spiked, moving from $3.55 when trading opened to $5.47 – a 70 percent increase. The buyers of these shares were mainly Bell clients. For example, on May 16, 2013, Wexler sold 1,000 shares at $4.34 per share directly to a client of Alamo Investment Advisors LLC ("Alamo"), where Bell was employed. In sum, Alamo clients purchased approximately 205,000 shares of CodeSmart during this time period.



30.     In addition, two sets of Bell clients stated that Bell purchased CodeSmart shares in their accounts without their consent. For example, in or about June 2013, Bell persuaded his clients, a married couple identified herein as "Bell Clients A and B," to purchase CodeSmart shares. According to Bell Clients A and B, Bell did not warn them of the risks in purchasing CodeSmart shares or penny stocks in general. On or about August 13, 2013, Bell Client A emailed Bell to complain about the falling value of his stock portfolio, noting that "in retirement, [he] cannot afford the volatile situation" and money loss. Bell Client A requested a meeting with Bell and that meeting was set for August 21, 2013. At the meeting, Bell offered to

sell Bell Clients A and B an additional 30,000 shares of CodeSmart for 14 cents per share.  That

day, the stock closed at $2.19 per share.  Bell told Bell Clients A and B that purchasing those

shares at the discounted price and selling them at the publicly-traded price would allow them to

profit such that they would recoup the value of their portfolio.  At Bell's heavy urging, Bell

Clients A and B signed the agreement and received the share certificate, which they still hold.

The stock purchase agreement for 30,000 shares of CodeSmart at $0.14 per share that Bell

offered Bell Clients A and B was issued by Fidelis and signed by Discala, which agents believe

is further evidence of Discala's central role in this manipulation scheme.

    31. At the same time that Bell was buying CodeSmart in his clients' accounts,

he was selling those shares from his personal trading account.  Instead of depositing his 125,000

CodeSmart shares in an account with his employing broker-dealer, Alamo, Bell opened a

brokerage account at Amegy Investments, Inc. ("Amegy"), a local Texas-based brokerage firm

affiliated with his bank.  From May 2013 through October 2013, Alamo's clients purchased over

one million shares of CodeSmart, while Bell sold 99,500 shares of CodeSmart that were in his

Amegy account.  Nearly half of the one million shares purchased by Alamo accounts were

purchased in Individual Retirement Accounts (IRAs), which suggests that Bell was using his

clients' retirement savings for the CodeSmart stock purchases.  Thus, Bell was purchasing shares

in his clients' accounts without telling them that he was personally taking an opposite position in

the stock.

    32. Like Bell, Josephberg also used his customers' accounts to enable himself

and his co-conspirators to sell out of their position in CodeSmart.  In particular, during the

second pump and dump that took place between August 22, 2013 and September 20, 2013,

Josephberg and Josephberg's sale assistant, engaged in heavy buying of CodeSmart in

Josephberg's customers' accounts.  Between August 29, 2013 and September 20, 2013, accounts

controlled by Josephberg and his assistant at Halcyon purchased at least 100,000 shares of

CodeSmart in customer accounts.

33.     At the same time that Josephberg was buying CodeSmart in his

customers' accounts, he was selling shares through his Garper accounts.  From May 2013

through October 2013, Josephberg purchased at least 140,000 shares of CodeSmart stock on

behalf of his customers while selling at least 256,000 shares of CodeSmart stock in the

Garper accounts.  For example, on August 29, 2013, Josephberg bought 9,000 CodeSmart

shares in the accounts of two of his customers, and sold 8,100 shares through his Garper

account.  Josephberg never disclosed to these two customers that he was personally taking an

opposite position, a material omission and strong proof of his intent to defraud.

34.     This fraudulent manipulation scheme was highly profitable for Discala,

Wexler, Bell and Josephberg.  Discala made approximately $3 million trading CodeSmart,

including $600,000 in profit in an account held in Discala's assistant's name but controlled by

Discala.  Discala's co-conspirators also profited significantly from this pump and dump.  Wexler

made over $2.2 million, Josephberg made approximately $750,000, and Bell made

approximately $550,000. Although Shapiro did not receive unrestricted stock, he was paid a

salary of $225,000.  In addition, as detailed above, Shapiro received 25,000 shares of CodeSmart

that were paid for by Discala.

> D.     The Next Stage of the Scheme: The Formation of Cubed

35.     After reaping the benefits of the manipulation of CodeSmart shares, the

Co-conspirators moved on to another stock.  Northwest Resources Inc. ("NWRS") was

incorporated in Nevada on May 21, 2010 and purported to be a mining exploration stage

company.  In reality, NWRS was a shell company with only nominal assets and no revenues

from inception through the end of its most recent fiscal year.   Similar to First Independence,

NWRS never took any significant steps in furtherance of its purported business plan.  Indeed, on

February 12, 2014, Northwest filed a Form 10-K, for the period ending November 30, 2013,

which noted that Northwest did "not have any arrangements for financing [additional

operations,]" "had not earned any revenues since the inception of [the] current business

operations[,]" had losses over $150,000 that far exceeded any assets and thus had "substantial

doubt[s] about [its] ability to continue" as a functioning corporation.  As of the February 12,

2014 filing date, Northwest's financial situation had not changed.

    36.  On March 6, 2014, NWRS filed a Form 8-K with the SEC reporting that

its CEO had resigned from the company and appointed Douglas Shinsato as the new sole officer

and director.  Prior to this appointment, Shinsato was the President and COO of Crackpot, a

"developer of a mobile-first information communications technology that offers users a digital

platform for the creation of content that combines text, images, audio, and video."  (See Form 8-

K at 1).  Similar to the CodeSmart reverse merger, an officer from the private entity replaced the

leading officer in the public entity.  Approximately one week later, on March 14, 2014, the

company filed another Form 8-K explaining that NWRS had changed its name to "Cubed, Inc."

and was in the process of changing its ticker symbol to "CRPT."  On March 24, 2014, Cubed

filed a Form 8-K reporting that it had entered into an intellectual property purchase agreement

with Crackpot pursuant to which it acquired intellectual property, a "mobile first-platform," from

Crackpot.

    37.  Thus, the new company called Cubed now had (1) Crackpot's former

officer at the helm, (2) Crackpot's business through the intellectual property and (3) Crackpot's

theoretical goodwill and name recognition through its new ticker symbol CRPT.  Although the

morphing of Crackpot into NWRS/Cubed through an asset purchase agreement was not a reverse

merger, as was the case with CodeSmart and FICF, the end result was that Crackpot, a private

company, effectively became Cubed, a publicly-traded company.  On March 26, 2014, Cubed's

board of directors appointed Joseph White as the new CEO and President, replacing Shinsato.

(See Form 8-K filed on March 27, 2014).  White was an original founder of Crackpot and an

even higher-level officer than Shinsato.

   38. Pursuant to the terms of the Intellectual Property Purchase Agreement,

Crackpot was compensated by Cubed with $350,000 and 2,537,455 shares of Cubed common

stock, all of which was due to be paid in installments starting in mid-April 2014.  (See Form 8-K

filed on March 24, 2014).  Since at the time of the agreement Cubed common stock was a penny

stock (attached to a company that had no assets), the terms of the contract indicated that the

intellectual property assets were actually worth at least $350,000.  That amount also reflected the

value of Cubed, since those assets effectively were all that Cubed possessed.

   E. The Manipulation of Cubed Shares and Use of the Device in the Scheme

   39. On March 28, 2014, 200 shares of Cubed were sold at $5 per share.  On

April 22, 2014, after 15 days of no trading activity, Cubed's stock began trading in earnest at a

price of $5.25 (the stock closed at $5.20).  A review of the evidence, including trading records

and text messages, shows that from April 22, 2014 through April 30, 2014, Discala, Wexler,

Bell, Josephberg, Kyleen Cane and Victor Azrak, together with others (the "Cubed Co-

Conspirators"), were responsible for manipulating the vast majority of the trading activity in

Cubed.  Of the 57,088 shares of Cubed bought during this period, 32,000 of them were bought

through Josephberg's assistant at Meyers Associates.   For example: (i) Dounya Discala

(Discala's wife) bought 6,100 shares and sold 700 shares; (ii) Joseph Discala (Discala's father) bought 1,500 shares; (iii) Bell bought 4,450 shares; (iv) Victor Azrak bought 500 shares; and (v) Ruben Azrak, Victor Azrak's father, bought 3,000 shares.

40.     On March 28, 2014, Morning Star, a ratings agency and provider of market information, reported that 200 shares of Cubed had been sold for a price of $5 per share. Although the amount of shares traded was small, because there was limited public information on the new company, Morning Star extrapolated from the $5 sales price that Cubed had a market capitalization of, or was worth, $148.85 million.  Yahoo! Finance similarly valued Cubed on March 28, 2014, at almost $150 million.  These approximately $150 million extrapolations of market capitalization based on the outstanding shares and $5 share price stand in stark contrast to the approximately $350,000 that Cubed paid Crackpot to obtain all its assets.  As demonstrated below, the investigation has revealed that Discala and his co-conspirators set the $5 share price and controlled the trading in Cubed.

41.     From April 22, 2014 through May 22, 2014, Cubed's share price gradually increased from a close of $5.20 to $5.42.  Then on May 23, 2014, Cubed's share price skyrocketed to a high of $7.05 before closing at $6.30.  From May 23, 2014 through July 2, 2014, Cubed's stock has been steady and fluctuated between $6.30 and $6.70.  This gradual but significant price increase from $5.00 per share on March 28, 2014 to $6.70 on July 2, 2014 – a significant increase of 34% for no apparent reason – further demonstrates the manipulation by Discala and his co-conspirators.  Cubed's stock's valuation does not reflect the underlying economics of the company.  At $6.58 per share, Cubed's market capitalization is approximately $170 million.  However, in a 10-Q filed for the period ending February 28, 2014, Cubed reported

less than $1,500 in cash, negative stockholders equity, a loss of $15,000, and accrued

professional fees of $131,824.

        42.    The government obtained a limited number of text messages for

telephones subscribed to by Bell and Wexler,[2] and also intercepted Discala's calls and texts over

the Discala Cell Phone between May 2, 2014 and June 29, 2014.  Agents believe that the

communications intercepted over the Discala Cell Phone, including some of those described

below, show that the Cubed Co-Conspirators, and others, fraudulently manipulated Cubed's

stock by artificially controlling the price and volume of Cubed's stock through, inter alia, match

trades and wash trades.[3]  Rather than generating significant market interest and causing a quick

pump and dump that would elicit regulators' scrutiny, the Cubed Co-Conspirators engaged in a

scheme that gradually increased the price of Cubed's stock to give it the appearance of a

legitimate company with genuine and steady market demand for the security.  The evidence from

the wiretap of the Discala Cell Phone shows that Discala was able to exercise control of this

process through a number of corrupt brokers and investors and by placing by the vast majority of

---

[2]    The three text search warrants issued from the Eastern District of New York were:
(i) on April 11, 2014, by Magistrate Judge Marilyn D. Go (14-MC-406); (ii) on April 24, 2014,
by Magistrate Judge Vera M. Scanlon (14-MC-481); and (iii) on June 3, 2014, by Magistrate
Judge Viktor V. Pohorelsky (14-MC-517).

[3]    Wash trades are purchases and sales of securities that match each other in price,
volume and time of execution, and involve no change in beneficial ownership.  For example, a
wash trade takes place when Investor A buys 100 shares at $5.00 of Company A through Broker
A while simultaneously selling 100 shares at $5.00 of Company A through Broker B.  Match
trades are similar to wash trades but involve a related third person or party who places one side
of the trade.  For example, a match trade takes place when Investor A buys 100 shares at $5.00 of
Company A through a broker, while Investor B, who coordinates with Investor A,
simultaneously sells 100 shares at $5.00 of Company A through a broker.  Both wash trades and
match trades are used to create the appearance that the stock price rose as a result of genuine
market demand for the securities.

Cubed's stock into one or more escrow accounts controlled by Cane. For the text messages and

calls described below, not all relevant portions of such communications have been described. To

the extent that quotations are used from intercepted conversations in the descriptions below, the

quoted segments are based on line sheets and drafts transcripts of the recordings and not final

transcripts. Also, all dates and times are approximate and based on the monitoring equipment at

the time the call was intercepted.

      43.    On April 2, 2014, starting at approximately 12:34 p.m. EST, Bell texted

Discala, who was using the Discala Cell Phone, "I got buyers in the market in California for

cube. Do u know when it is live to buy[?]" Discala responded, "Waiting with baited breathe[.]"

      44.    On April 11, 2014,  starting at approximately 4:14 p.m. EST, the

following text message exchange took place took place between Discala and Bell:

| Bell: | FedEx send you money for cube on Monday. Made out to Omniview |
|---|---|
| Discala: | Great |
| Bell: | I'm excited about Monday. Cube start the trade. |
| Discala: | Yes sir |
| Bell: | Sweet. Have a great weekend[.] |

      45.    On April 17, 2014, starting at approximately 11:39 a.m. EST, the

following text message exchange took place between Discala and Bell:

| Bell: | Any idea on cube trading. I'm bidding 5.25 |
|---|---|
| Discala: | Not yet. |
| Bell: | Today you think?  Ingot buyers ready and they are asking |
| Discala: | I think so. |
| Bell: | Cool |

Discala:        Tell them to bid size

Bell:           Ok

46.     On April 22, 2014, the first real day of trading in Cubed, starting at
approximately 8:07 a.m. EST, the following text message exchange took place between Discala
and Bell:

Bell:           I got my bids in again. Let's see how it goes

Discala:        Me too.

Bell:           We be trading

Discala:        Buy some brother. Let's go.

Bell:           Just did. 5.25

Discala:        400 shares. Let's make some calls

47.     On April 24, 2014, starting at approximately 10:41 a.m. EST, the
following text message exchange took place between Discala and Bell, during which Discala
asked Bell to get his contacts to bid $5.27 for Cubed stock:

Discala:        Make calls.

Discala:        Bids please

Bell:           What price

Discala:        527

Bell:           Ok.

Discala:        Where's u r cali guys

Bell:           Incalled last night

Discala:        Need buys. Bad

Bell:           Bidding 800 at 5.27

| Discala: | Hurry |
|---|---|
| Discala: | Nice. |
| Bell: | I filled |

48.     Also on April 24, 2014, Wexler, using DEVICE 1, sent a text message to the Discala Cell Phone complimenting Discala on a Cubed press release that had been issued that day: "That's a nice release! Well done pops."  Discala replied, "Trying my best."

49.     On May 2, 2014, starting at approximately 5:26 pm EST, the following telephone conversation took place between Discala, using the Discala Cell Phone, and Azrak in which they discuss both the stock price of Cubed and Discala's prior scheme involving Codesmart (ITEN):

| Azrak: | Let me just tell you something. You know that Jobo [Josephberg] is so bad, he can even make the Cube go down. [laughs] |
|---|---|
| Discala: | I know it went high, and then it went down. It was definitely Jobo. |
| Azrak: | That was a huge drop today, no? No, you know what bothered me? He ruined our streak. |
| Discala: | No, I'm fine with it. It was a penny. Remember, I had a penny down in ITEN. |
| Azrak: | You did? |
| Discala: | One — yeah, one penny. |

50.     On May 6, 2014, starting at approximately 10:40 a.m. EST, the following text message exchange took place between Discala and Josephberg, during which conversation Discala directed Josephberg to have one or more of his clients offer a higher bid on Cubed shares (to $5.31) and Josephberg responded that he was in a meeting with his firm's compliance officer and asked Discala to make the request of another broker:

| Discala: | MOVE UP. PLEASE |
|---|---|

Discala:            Go 531.  Please

Josephberg:      In w compliance...can u call [another broker] pls[.]

      51.     On May 8, 2014, starting at approximately 9:40 a.m. EST, Discala spoke

to a corrupt investor ("Investor 1") who had invested in Cubed through  an escrow arrangements

that Discala coordinated.  Discala explain the structure as follows:

Discala:            I'm well sir, I got that email, the wonderful thing about the CUBE is some
                    big announcement coming, on that … the escrow, when you say, when is
                    your stock available for sale, you've already sold some, you're an [U/I]
                    owner in the escrow so there's been like 90 thousand shares sold. They
                    haven't done a distribution [U/I] 30 days but there's already a half a
                    million dollars that's been sold

Investor 1:        Ok, I didn't know if you could sell it or there was a lock up period.

Discala:            No, no, this is part of the supply, we'll call it it, right, it is in different
                    escrows not controlled by us and it's sent into the market as demand is
                    needed, so there's no evil that can play with us.  There's no shorts that can
                    come in, I mean if you look at the box right on the level 2 it's incredible if
                    531 - 531 by 532 and it goes to 7 - 750 [U/I]

Investor 1:        So I'm already making money

Discala:            Yea, you're already making money, yeah, absolutely and the interesting
                    thing is that [Investor 1] you nor I nor any my father nor any of the 25
                    people in the escrow, right, gets out before anybody else [U/I] it's all
                    tiramisu

Investor 1:        It's all. [U/I], that's good, so you're going to sell it off over the next 3
                    months or 6 months?

Discala:            Yea, I would say this thing's going to rip, I mean I would say that we be
                    doing the escrow, you're exactly right, 3-6 months on the markets[.]

      52.     On May 8, 2014, starting at approximately 6:52 p.m. EST, the following

text message exchange took place between Discala and Wexler, who was using DEVICE 1:

Discala:            Had great call with [Kyleen Cane]. She's on the marketing.

Wexler:             That's friggin great news. Wow can wait to hear those details. That's so
                    [good] to hear

Discala:      Just had it.  She's on it bro.  Had call 30 minutes ago.  She's ramping up[.]

53.    On May 12, 2014, starting at approximately 5:28 p.m. EST, the following

telephone conversation took place between Discala and Azrak, during which conversation

Discala explained that Josephberg purchases Cubed stock for his unwitting clients:

Discala:      He's not going to get someone else to buy it.  He means he'll stuff it in
              someone else's account….

Azrak:        [laughing] …We should start sending him morons, by the way.  We could
              trade for free, you know, send him a moron, you know, a guy you don't
              know and then we'll just buy stocks and if they don't go up by the end,
              we'll buy, like, options—Twitter options—that expire in, like, a day.
              Either we'll make like twenty times or we'll just give him the stock.
              [laughing]

Discala:      So, by the way—so—you're not getting it, that's what Jobo does.

Azrak:        No, I know, that is what he does, I know.

Discala:      It's exactly—no, no this is what he does.  He does it with the firm, and
              then he's like, "Aw, fuck, I lost on this one." If he wins he keeps the
              money, and if he loses—

Azrak:        If he loses, the guy gets shtupped, yeah, I know.

Discala:      Exactly. It's like going to the casino with their chips. [laughs]

54.    On May 17, 2014, starting at approximately 5:28 p.m. EST, the following

telephone conversation took place between Discala and Wexler, who was using DEVICE 1,

regarding Discala's plan to purchase software from Cubed so that it would look like Cubed was

generating business:

Discala:      And we're gonna, we're gonna pay, we're gonna buy a piece of software
              from the Cube…so we look like—

Wexler:       When?

Discala:      In May; so we're cash flow positive.

Wexler:      We're going to buy a piece of software from the Cube.

Discala:     Correct.  So our deal is going to pay the Cube two-fifty, because these guys can't generate revenue, so I'm going to generate it myself.

55.     On May 19, 2014, starting at approximately 10:13 a.m. EST, the following telephone conversation took place between Discala and Josephberg, during which conversation Discala instructed Josephberg to buy Cubed shares in certain intervals so as to upwardly inflate the share price and Josephberg agreed to do so:

Josephberg:  Yo, can you hear me?

Discala:     Yeah, I just got pulled over for trying to call you, can you buy like some CRPT 100, 200 then 100…just buy 100, then buy 200, then buy another 100.…

Josephberg:  Ok.

56.     On May 20, 2014, starting at approximately 5:46 p.m. EST, the following text message exchange took place between Discala and Josephberg, during which Discala instructed Josephberg to buy Cubed stock and Josephberg agreed to purchase stock in his clients' accounts:

Josephberg:  I spoke [to Kyleen Cane] she awesome

Discala:     I KNOW. BEEN TELLING YOU THAT. BUY CRPT. GOING NUTS

Josephberg:  Why [is] no[] one buying?  I am going to buy more for clients...meet tomorrow?

Josephberg:  I just need to get my hands on some liquidity...

Josephberg:  And more clients lol

57.     On May 20, 2014, starting at approximately 7:29 p.m. EST, the following telephone conversation took place between Discala and Azrak, during which they discussed a

conversation between Cane and Josephberg about the escrow account and Discala explained that

he controlled the stock price of Cubed:

| | |
|---|---|
| Discala: | Dude, it went up – by the way, [Josephberg] goes up to [Kyleen Cane] I'm buying CRPT for my clients tomorrow.  I'm like I told you, you fucking idiot. [U/I] |
| Azrak: | Yeah, he tells me…uh…he tells me he had a great conversation with her, you know.  You know, about the escrow.  She didn't really want to talk about the escrow too much, you know? |
| Discala: |  Of course not, not with a fucking idiot like Jobo!  Of course not! |
| Azrak: | I told them they can't really tell you that stuff.  I told him you really shouldn't have – |
| Discala: | I told him not to talk about it. He's a fucking asshole! That's what he is. He's an asshole. Because he's putting at risk our proprietary...I'm telling ya.  It's like Apple giving away software.  He's a fucking asshole. |
| *        *        * | |
| Azrak: | How high does it really go? |
| Discala: | Which one? |
| Azrak: | CRPT. |
| Discala: | I think 55. |
| Azrak: | [U/I] Give me a real number, over-under. |
| Discala: | 55. |
| Azrak: | Seriously? |
| Discala: | I'll take the over-under on 55 by the end of the year. |
| Azrak: | How you like me now? |
| Discala: | I'll bet you 100 thousand dollars right now. |
| Azrak: | Seriously?  …That means I make 10, so I don't give a fuck. |

| | |
|---|---|
| Discala: | Exactly, I'll bet you 100 grand.  I'll bet you 100 grand.  Done.  We'll write it up tomorrow.  We'll sign it. |
| Azrak: | How you like me now? |
| Discala: | By the way, by the way, you're a fucking idiot. |
| Azrak: | [U/I] |
| Discala: | You're an idiot. |
| Azrak: | [U/I] |
| Discala: | No, no, no.  You're just an idiot, by the way. |
| Azrak: | Why?  You said 55 bucks. |
| Discala: | Right, because I'm the fucking brake and the gas, jackass.  If I take my foot off the brake it's 55 [dollars] tomorrow (Laughter). |

58.     On May 21, 2014, starting at approximately 12:53 p.m. EST, the following telephone conversation took place between Discala, using the Discala Cell Phone, and Cane, , during which (a) Cane informed Discala that her investor relations/public relations  ("IR/PR") contacts would assist with the marketing of Cubed, (b) Cane informed Discala that she had lined up two short-term investors ("interim money"), and (c) Discala asked Cane to have her associate bid $5.42 for Cubed stock:

| | |
|---|---|
| Cane: | And, and I think, uh, I just got a great call, um, with my, uh, IR/PR guys |
| Discala: | Great. |
| Cane: | You know they're going to be doing it and I also just talked to two people that are gonna probably going to put in another half a million into Cubed for some interim, interim money. Do you want me to have them go through you for this? Or do you want me to just— |
| Discala: | No I don't care. Just do it. No, no, I don't, I—there's no pride of authorship. We're a team. I think it's wonderful you should take the credit. |
| Cane: | No, I [U/I] |

| | |
|---|---|
| Discala: | I, I, I told them— |
| Cane: | I would much rather you take the credit. [laughs] |
| Discala: | OK, so I have no problem. That'd be great. But the bottom line is— |
| Cane: | I'll just tell them—I'll just tell them it's, uh, you know, part of the team. |
| Discala: | Yeah, that's exactly right. I have no problems, no issues. Can you just do, do me a favor? Can you go—can you just make a quick call and go 5 4 2 [on Cubed]? Because Chardan's getting mad that it's just sitting there. It just looks like, it just looks crazy. I'm trying to lift 'em. |
| Cane: | Wait who? |
| Discala: | Just go 5 4 2. Have [your associate] go 5 4 2, not 5 4 0. |
| Cane: | Oh, oh 5 4 2. |
| Discala: | It just looks like it's so deep. You gotta just—he's gotta move it around a |
| Cane: | OK, all right. Wait, why does it look stupid? |
| Discala: | Because it just — he just sits there and we go in a thousand, five hundred, a thou— I mean it just sits there, it looks like it's the, the abyss. |
| Cane: | OK. All right, I don't know if we want, if we want to keep it, you know, |
| Discala: | Go 5 4 1, 5 4 1, 5 4 1 is fine. |
| Cane: | OK. All right. I'll, um, I'll  ask him to move it up a little. |

59.     On May 22, 2014, starting at approximately 10:33 a.m. EST, the following telephone conversation took place between Discala and Josephberg, during which conversation Discala instructed Josephberg to buy Cubed shares for Azrak's account and Josephberg questioned whether doing so would reveal his complicity in the scheme:

| | |
|---|---|
| Discala: | Alright, so have, uh, buy 200 for Victor [Azrak]. |
| Josephberg: | 200 for Victor. |
| Discala: | He sold 300 yesterday, I told him [U/I] he fucked it all up so just 200 for Victor. He had a bris. Or, or, or you know what, try 100, and see if they |

move, they move outta the way, and then, and then put 100 on the bid. [U/I] show some de—I gotta show some depth on the, on the—

Josephberg:   But who else is buying?

Discala:   It's—ok, you gotta slow the fuck—I'm telling you, you gotta, things are happening.  Did you not talk to Kyleen? Did you not—

Josephberg:   Then who else is buying today? I don't want to be the only one buying today. I heard it looks very bad for a broker to be the only one buying, that's what I heard.

60.   On May 23, 2014, due to poor coordination with a co-conspirator, Discala briefly lost control of his manipulation of Cubed's share price, which caused it to surge from the previous day's closing price of $5.42 to an intraday high of $7.05 per share.  However, as reflected in the intercepted calls over the Discala Cell Phone, Discala was able to regain control that same day and brought the share price back down to have it close at $6.30 per share.

61.   During a telephone call that morning of May 23, 2014, starting at approximately 11:11 a.m. EST, the following conversation took place between Discala and Cane, during which conversation they discussed the jump in Cubed's price to $7 per share, lamented the lack of coordination and put together a plan to correct the error:

Cane:   That is really weird. Um, they've been selling—they've been selling all over 7—$7. Somebody's buying it that I don't have any access to.  It might be at [the trading firm] but, um, [that co-conspirator] is not even there.  I'm going to call his cell right now and see—

Discala:   What would you like me to do here?  I can do—I—uh, this is my box. I mean, what would you like me to do? The reason I called you—because I said, "Look, I'm gonna come back down to 5.55," and then all of a sudden when I was on the phone with [another co-conspirator], they, said, "I'm getting hit by—I'm tr—[the trading firm is] coming into me."  So then I said, "OK, well maybe [he] is doing something that, that, that GP wants to do—I don't know."

Cane:   No, it's not me. I'm not having anything going on.

Discala:   Yeah, that's right. That's, so, OK you want me to—

Cane:          We need to keep it back down now. We need to keep it back down.

Discala:      OK. All right, you want it back?

Cane:          Yeah, um, but let me call [the trader] right now and find out so he can come in and take charge and find out what the fuck's going on. 'Cause I—

Discala:      Yeah, by the way, it was a 100% back that went into—do you want me—do you want me to go—you want me to bring this to 6.05? This is, I mean, it's gonna ruin the chart, it's like, it kills me, it just kills me that they did this.

Cane:          I know, I don't what, I don't know what it is. It's not [U/I] whatever it's gonna be, but we're gonna, um, we're gonna have—uh, I don't know. Let me call [him] and find out if he knows [U/I]

Discala:      You let me know, I mean I can, I can go down, I can, I can get it to where you, I mean I can do what you want me to do, is what I'm telling you[.]

62.      Later that day, during a telephone call between Discala and Azrak, Discala stated, in part, "I talked to Kyleen, and we, we don't want this. We would want 6.35 today, 6.30, something like that, and then let, let news rip it next week."

63.      Finally, on that same day, Discala also called Wexler, who was using DEVICE 1, to explain the trading in Cubed's share price, and stated, in part, "Yeah like…it just looks stupid! It went up, and up, and then it came back, you know – it's like, look, if we ended at 6.30, we're good. I want to bring it back up to 6.55; 6.55 on Tuesday, which I can, with some news, right? And just keep stepping it."

64.      On May 27, 2014, starting at approximately 10:29 a.m. EST, the following conversation took place between Discala and Cane, during which conversation they discussed the fact that Cubed was not being actively traded, with Cane noting that she expected a press release soon to move the market but Discala directed her have the share price move even without the press release:

Discala:     Can you have [the trader] just cause I get flak from my, from my seg guys just have him move a penny, move that, you know.  It can't just sit there like the deep, like an abyss.

Cane:        Well it's um, it's gonna start happening, uh, we just, I don't know if the press has even come out yet.  Um, there's gonna be a release today and on the, um, um, on the, um, acquisition, and then there's going to be a follow up, the people we're having a conference call in about 30 minutes with the first PR that's gonna go out the PR group.

Discala:     Oh great.  So, no, no, that's wonderful.  [But] it's just sitting there at 630.  If he goes to 631 it's a big difference optically for my guys.

Cane:        OK
.
Discala:     It can go back to 630 later, you know you just got to move it around. It just doesn't uh it looks like he's there for a bazillion.

65.     On May 30, 2014, at approximately 9:59 am, Josephberg called Discala and Discala stated, "Do me a favor . . . can you do five hundred CRPT five times every five minutes[?]"  Josephberg confirmed, "CRPT a hundred every five minutes[,]" but added, "Won't that look weird [rather] than just buying five hundred[?]"  Discala responded, "No it looks better[,] do a hundred then two hundred then a hundred[,] you know it looks better[.]"  Josephberg concluded, "Alright."  Based on my training, experience and knowledge of this investigation, I believe that in this conversation, Discala directed Josephberg to buy Cubed stock in a way that would upwardly inflate the share price and volume.

66.     On June 6, 2014, at approximately 5:28 p.m. EST, the following conversation took place between Discala and Wexler, who was using DEVICE 1, during which conversation they complained that Cane, who was coordinating the trading, allowed the share price of Cubed to close slightly lower going into the weekend to avoid the appearance that the stock was being manipulated by continuing to climb:

Wexler:      Yeah, yeah, yeah, yeah.  So anyway, well.  I don't know what you you know I guess she's kind of. I know what she's trying to do.  She's trying to

| | |
|---|---|
| | make it look like it ain't going up every fucking day, that's what she's trying to do. |
| Discala: | [U/I]  Exactly, exactly. . .Idon't mind her doing that on Monday or Tuesday, right?  You don't do that to me on the way into the weekend.  It just don't work that way.  I don't.Idon't need two days of, you know, bullshit. |
| Wexler: | Yeah, yeah, yeah, yeah I know.  She didn't mention. she didn't mention something about it being Friday.  And I was like, listen, I know. fucking doesn't look good or whatever.  We don't need to go up every fucking day, but the bottom line is.  You know, we're fucking supporting the stock. . |

67.     On June 15, 2014, at approximately 10:55 a.m. EST, Discala sent a text message to Cane stating, "We are on fire."  Cane responded, "You make it all happen.  Thx."  Discala then replied, "It['] s finally going very well And i attribute a lot of it to YOU[.]"

68.     Agents believe that Discala, Wexler, Bell, Josephberg, Cane, and Azrak, together with others, continued to fraudulently manipulate Cubed's stock using the escrow account.  On June 23, 2014, Cubed reached its highest closing price of $6.75 per share.  At $6.75 per share, Cubed's market capitalization was approximately $200 million.  On April 21, 2014, however, Cubed filed with the SEC a Form 10-Q and reported less than $1,500 in cash, negative stockholders equity, a net loss of $15,000 and accrued professional fees of $131,824.  On July 9, 2014, Cubed's stock price closed at $6.60 per share, which indicated that it was still in the controlled pump phase of the fraudulent manipulation scheme orchestrated by the Cubed Co-Conspirators, as is further evident from the chart below.



69.     Based on my knowledge, training, and experience, including conversations with other FBI agents in New York, I know that the DEVICE can store information for long periods of time.  Similarly, to the extent the DEVICE has been used for Internet viewing, things that have been viewed via the Internet are typically stored for some period of time on the Device.  This information can sometimes be recovered with forensic tools.

IV.     TECHNICAL BACKGROUND

70.     As further described in Attachment B, this application seeks permission to locate not only data that might serve as direct evidence of the crimes described on the

36

warrant, but also for forensic electronic evidence that establishes how the DEVICE was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence can be recovered from the DEVICE because:

a.      Data on an electronic device can provide evidence of a file that was once on the device but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave traces of information on the device that show what tasks and processes were recently active.  Web browsers, email programs, and instant messaging "chat" programs store configuration information on the device that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the device was in use.  Electronic devices can record information about the dates files were created and the sequence in which they were created.

b.      Forensic evidence on an electronic device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, email, email address books, instant messaging or chat logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the electronic device at a relevant time.

c.      A person with appropriate familiarity with how an electronic device works can, after examining this forensic evidence in its proper context, draw

conclusions about how devices were used, the purpose of their use, who used them, and when.

        d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on an electronic device that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, such evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on an electronic device is evidence may depend on other information stored on the device and the application of knowledge about how the device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

        e.     Further, in finding user attribution evidence, sometimes it is necessary to establish that a particular thing is not present on an electronic device. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

        f.     I know that when an individual uses an electronic device to commit wire fraud, the individual's electronic device may generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the device was used; data that was sent or received; notes as to how the criminal conduct was

achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

60.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

61.     Because these warrants seeks only permission to examine a device that is already in law enforcement's possession, the execution of this warrant does not involve intrusion into a physical location.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

VI.     <u>CONCLUSION</u>

62.     Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that on the DEVICE there exists evidence of crimes.  Accordingly, a search warrant is requested.

WHEREFORE, your deponent respectfully requests that the requested search warrant be issued for THE PREMISES KNOWN AND DESCRIBED AS ONE CELLULAR TELEPHONE WITH TELEPHONE NUMBER 732-261-6430, ISSUED BY CELLCO PARTNERSHIP DBA VERIZON WIRELESS AND SUBSCRIBED TO MARC WEXLER,

1070H HIGHWAY 34, 113, MATAWAN, NEW JERSEY 07747-3480, WITH IMEI

NUMBER 3587550549123605

S/ Constantine Voulgaris

_____

Constantine Voulgaris
Special Agent
Federal Bureau of Investigation

Sworn to before me this
_4th_ day of August, 2014
          S/ Steven Gold

_____

THE HONORABLE STEVEN M. GOLD
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

## ATTACHMENT A
### Property to Be Searched

The property to be searched is ONE CELLULAR TELEPHONE WITH TELEPHONE

NUMBER 732-261-6430, ISSUED BY CELLCO PARTNERSHIP DBA VERIZON

WIRELESS AND SUBSCRIBED TO MARC WEXLER, 1070H HIGHWAY 34, 113,

MATAWAN, NEW JERSEY 07747-3480, WITH IMEI NUMBER 3587550549123605,

hereinafter the "Device." This warrant authorizes the forensic examination of the Device for

the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B
Particular Things to be Seized

All information obtained from Device will be maintained by the government for the purpose of authentication and any potential discovery obligations in any related prosecution. The information shall be reviewed by the government only for the purpose of identifying and seizing all information described below that constitutes fruits, evidence and instrumentalities of a conspiracy to commit securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1349, including:

1.     All records and information on the Device described in Attachment A, including names and telephone numbers, as well as the contents of all call logs, contact lists, text messages, emails (including those sent, received, deleted and drafted), instant messages, photographs, videos, Facebook posts, Internet activity (including browser history, web page logs, and search terms entered by the user), and other electronic media constituting evidence, fruits or instrumentalities of a conspiracy to commit securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1349;

2.     Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as, for example, logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3.      Evidence of software that would allow others to control the Device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

4.      Evidence of the lack of such malicious software;

5.      Evidence of the attachment to the Device of other storage devices or similar containers for electronic evidence;

6.      Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device;

7.      Evidence of the times the Device was used;

8.      Passwords, encryption keys, and other access devices that may be necessary to access the Device; and

9.      Contextual information necessary to understand the evidence described in this attachment, all of which constitute evidence, fruits and instrumentalities of a conspiracy to commit securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1349.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.